**FOR PUBLICATION**

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| ANDRE VERDUN; IAN ANOUSH GOLKAR, on behalf of himself and a class of all others similarly situated, | No.    21-55046 |
| Plaintiffs-Appellants, | D.C. No. 3:19-cv-00839-AJB-WVG |
| v. | OPINION |
| CITY OF SAN DIEGO; SAN DIEGO POLICE DEPARTMENT, | |
| Defendants-Appellees. | |

Appeal from the United States District Court
for the Southern District of California
Anthony J. Battaglia, District Judge, Presiding

Argued and Submitted February 17, 2022
Pasadena, California

Before:  Daniel A. Bress and Patrick J. Bumatay, Circuit
Judges, and Robert S. Lasnik,[*] District Judge.

Opinion by Judge Bress;
Dissent by Judge Bumatay

---

[*] The Honorable Robert S. Lasnik, United States District Judge for the
Western District of Washington, sitting by designation.

# SUMMARY[**]

## Civil Rights

The panel affirmed the district court's summary judgment for defendants and held that municipalities are not required to obtain warrants before chalking tires as part of enforcing time limits on city parking spots.

Plaintiffs brought a putative class action under 42 U.S.C. § 1983 alleging that tire chalking violated the Fourth Amendment. The panel held that even assuming the temporary dusting of chalk on a tire constitutes a Fourth Amendment "search," it falls within the administrative search exception to the warrant requirement. Complementing a broader program of traffic control, tire chalking is reasonable in its scope and manner of execution. It is not used for general crime control purposes. And its intrusion on personal liberty is de minimis at most.

Dissenting, Judge Bumatay stated that the administrative search exception is still the exception. It is no doubt true that law enforcement, traffic enforcement, and almost any other government function would be more efficient and more convenient if officers could skirt the Fourth Amendment. But neither the original understanding of the Fourth Amendment nor Supreme Court precedent permit a policy of indiscriminate searches for such an ordinary government enterprise. While chalking tires may not constitute the greatest affront to personal liberty, the court's

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

duty is to safeguard against even "stealthy encroachments" on the Fourth Amendment. Thus, Judge Bumatay would not expand Fourth Amendment exceptions to accommodate the City's chalking program and would hold that it is unconstitutional.

---

## COUNSEL

---

Daryoosh Khashayar (argued), Khashayar Law Group, San Diego, California; Ramin R. Hariri, Hariri Law Group, San Diego, California; for Plaintiffs-Appellants.

Meghan A. Wharton (argued), Deputy City Attorney; George F. Schaefer, Assistant City Attorney; Mara W. Elliott, City Attorney; Office of the City Attorney, San Diego, California; for Defendants-Appellees.

**OPINION**

BRESS, Circuit Judge:

We are asked to decide whether the longstanding practice of chalking tires for parking enforcement purposes violates the Fourth Amendment. It does not. Even assuming the temporary dusting of chalk on a tire constitutes a Fourth Amendment "search," it falls within the administrative search exception to the warrant requirement. Complementing a broader program of traffic control, tire chalking is reasonable in its scope and manner of execution. It is not used for general crime control purposes. And its intrusion on personal liberty is de minimis at most. We hold that municipalities are not required to obtain warrants before chalking tires as part of enforcing time limits on city parking spots. We affirm the district court's grant of summary judgment to the City of San Diego.

**I**

The City of San Diego owns thousands of parking spaces that are located on City property. The San Diego Municipal Code governs the use of the City's parking spaces. Drivers who violate the Code's parking regulations may be required to pay civil fines. Pursuant to the Code, the City imposes time limits that are publicly posted and that restrict how long a vehicle may remain in a particular parking spot.

Since at least the 1970s, San Diego has used tire chalking as one method of enforcing time limits for its parking spaces. Chalking consists of a City parking officer placing an impermanent chalk mark of no more than a few inches on the tread of one tire on a parked vehicle. The parking officer must place the chalk mark on every vehicle parked in a given area of the City; officers do not single out particular vehicles

for chalking. If a vehicle's chalk mark is undisturbed after the parking limit has expired, this shows the vehicle has exceeded the time limit for the space. The parking officer may then issue a citation for violation of the City's parking regulations. According to the district court's findings, the chalk mark on the tire rubs off within a few tire rotations after driving.

The record reflects that San Diego's parking enforcement methods, including chalking, are intended to enhance public safety, improve traffic control, and promote commerce. Insufficient parking enforcement can lead to widespread noncompliance with the City's parking limits, whereas consistent enforcement increases parking space turnover and allows the City to increase the availability of parking in high-demand areas. When parking spaces do not regularly turn over, drivers may engage in "cruising"—that is, circling blocks in search of parking—or may double-park in lanes of traffic while waiting for spaces to become available. Drivers may also illegally park in zones reserved for buses, disabled drivers, or emergency personnel.

Insufficient parking impacts public safety. Cruising, double parking, and illegal parking all lead to increased traffic congestion that makes it more difficult for public buses and emergency vehicles to navigate city streets. Illegally parked vehicles may block access to fire hydrants or bus lanes. Greater traffic volume poses greater safety risks to pedestrians, bicyclists, and drivers, and drivers searching for spots are also distracted and more likely to cause collisions. Stop-and-go traffic and idling vehicles associated with congestion and parking shortages also result in increased localized vehicle emissions.

Increasing parking availability and reducing traffic congestion in turn improves commerce. Local businesses

and commercial districts depend on the availability of parking. Enforcing parking time limits by chalking tires improves parking turnover and encourages customers to visit, shop, and dine within a reasonable time to allow more customers to do the same. Businesses and restaurants have frequently complained to the City about the availability of parking, and often request that the City enforce parking time limits more regularly. Expanding parking availability increases commercial activity and, correspondingly, the City's sales tax revenues.

Although the City has other ways of enforcing its parking regulations, there is considerable evidence that chalking is its most cost-effective method, and that it is more efficient and accurate than other methods. Photographing cars, for instance, would require parking officers to take and review hundreds of photographs. The City cannot currently manage the volume of data that would be involved in such an effort. The City previously experimented with the use of streetlight cameras for parking enforcement but abandoned the program after it posed too many difficulties. Visual marking—which requires officers to record information about a vehicle and then check their notes later—is less efficient and more time-consuming. After the City used visual marking briefly during the pendency of this litigation, it received an uptick in complaints from business owners about vehicles overstaying parking limits.

In recent years, some municipalities have adopted License Plate Reader (LPR) technology to enforce parking regulations. Although LPR technology is effective, it would cost the City millions of dollars and take several years to implement. LPR technology would also require the City to maintain time-stamped photographs and Global Positioning System (GPS) data for vehicles parked in City parking spaces, which could raise privacy concerns. In short, San

Diego views tire chalking as superior to other methods of parking enforcement.

Plaintiffs Andre Verdun and Ian Anoush Golkar each received at least one parking citation from the City after their vehicles were chalked.  In May 2019, they filed a putative class action under 42 U.S.C. § 1983, alleging that tire chalking violated the Fourth Amendment.  Plaintiffs asked for an injunction against chalking and monetary damages. The alleged damages consist of amounts the putative class has paid in parking tickets when their cars were ticketed after chalking.

The district court concluded that tire chalking constitutes a Fourth Amendment search but that it is justified under the administrative search exception to the warrant requirement. The district court thus granted summary judgment to the City.  Plaintiffs timely appeal.  Our review is de novo. *Butcher v. Knudsen*, 38 F.4th 1163, 1168 (9th Cir. 2022).

## II

### A

The Fourth Amendment, which applies to the City of San Diego through the Fourteenth Amendment, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend IV.  Before the reorientation of Fourth Amendment "search" doctrine around the physical trespass theory, as set forth in *United States v. Jones*, 565 U.S. 400, 406–07 (2012), and later in *Florida v. Jardines*, 569 U.S. 1, 5 (2013), it is not apparent that anyone viewed tire chalking as presenting a grave question of constitutional law, or indeed any question of constitutional dimension.

There is evidence that municipalities have been chalking tires for parking enforcement purposes since at least the 1930s. *See* Kerry Segrave, *Parking Cars in America, 1910–1945: A History* 120 (2012) (discussing tire chalking in 1935 in Dallas, Texas); *Owens v. Owens*, 8 S.E.2d 339, 340 (S.C. 1940) (noting the practice of tire chalking in Columbia, South Carolina); *State v. Sweeney*, 5 A.2d 41, 41 (N.H. 1939) (describing a police officer chalking a tire in Nashua, New Hampshire); *Commonwealth v. Kroger*, 122 S.W.2d 1006, 1007 (Ky. Ct. App. 1938) (describing a policeman chalking a tire in Newport, Kentucky on November 7, 1938). In San Diego, tire chalking has been used since at least the 1970s.

For most of tire chalking's nearly one-hundred-year history as a parking enforcement tool—a history that would seem to coincide with the rise of the automobile—it appears that tire chalking went unchallenged on constitutional grounds. Plaintiffs have not cited any challenges, successful or otherwise, to the constitutionality of tire chalking that predated *Jones*. So there is some reason to be skeptical of plaintiffs' effort to have us suddenly declare as violating the United States Constitution a rather innocuous parking management practice that has been commonly used without question for several generations in localities across the country. *Cf. NLRB v. Noel Canning*, 573 U.S. 513, 533 (2014) ("[T]hree-quarters of a century of settled practice is long enough to entitle a practice to 'great weight in a proper interpretation' of the constitutional provision.") (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929)).

But we will put any such skepticism completely to the side and undertake a full analysis under the Fourth Amendment. The initial question is whether tire chalking is even a Fourth Amendment "search" in the first place. We will assume without deciding that it is. The plaintiffs rely heavily on *Jones*. There, the Supreme Court held that a

search occurs when the government "physically occup[ies] private property for the purpose of obtaining information." 565 U.S. at 404. It is not clear *Jones* should be read to suggest that every physical touch that is designed to obtain information, even one as fleeting as tire chalking, rises to the level of a "physical intrusion," as required for a Fourth Amendment search. *Id.*; *see also* Orin S. Kerr, *The Curious History of Fourth Amendment Searches*, 2012 Sup. Ct. Rev. 67, 90–93 (2012) (discussing ambiguities in *Jones*'s conception of trespass). And even if it would be correct to describe chalking as a search of the car itself, which is unclear, there would also appear to be meaningful differences between chalking a parked car and the GPS device at issue in *Jones*, which provided weeks' worth of data on where a person traveled, a veritable treasure trove of information. 565 U.S. at 403.

Despite these questions, we will assume that chalking is a search and proceed to the rest of the analysis.

**B**

Warrantless searches are presumptively unreasonable under the Fourth Amendment, subject to certain exceptions. *City of Los Angeles v. Patel*, 576 U.S. 409, 419 (2015). One such exception, perhaps more accurately described as a set of exceptions, is known as the "administrative search" or "special needs" exception. The Supreme Court has explained that "[s]earch regimes where no warrant is ever required may be reasonable where 'special needs . . . make the warrant and probable-cause requirement impracticable,' and where the 'primary purpose' of the searches is '[d]istinguishable from the general interest in crime control.'" *Id.* at 420 (first quoting *Skinner v. Ry. Lab. Execs. Ass'n*, 489 U.S. 602, 619 (1989), and then quoting *Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000)); *see*

*generally* Eve Primus, *Disentangling Administrative Searches*, 111 Colum. L. Rev. 254 (2011) (surveying administrative search exception doctrine).

Despite their different names, the Supreme Court has often discussed "administrative" and "special needs" searches together. *See, e.g.*, *Patel*, 576 U.S. at 420–23; *Ashcroft v. al-Kidd*, 563 U.S. 731, 736–37 (2011). As we once put it, "[t]here is a 'special needs' exception to the warrant requirement for administrative searches." *Whalen v. McMullen*, 907 F.3d 1139, 1151 (9th Cir. 2018). For purposes of our analysis, we thus treat administrative and special needs searches together, as species of a common genus.

Housed within this broader category of administrative or special needs searches lie several archetypal situations in which the Supreme Court has recognized that countervailing interests outweigh the Fourth Amendment's default insistence on a warrant. Most relevant here, and as we discuss further below, the Supreme Court has permitted various types of dragnets in which police indiscriminately stop motorists without individualized suspicion or a warrant, when the stops are not used for the primary purpose of detecting general criminal wrongdoing. *See generally Demarest v. City of Vallejo*, 44 F.4th 1209, 1216–20 (9th Cir. 2022) (canvassing this doctrine). The Supreme Court has thus upheld against a Fourth Amendment challenge a permanent immigration checkpoint away from the international border at which officers stopped cars to determine the immigration status of the travelers. *United States v. Martinez-Fuerte*, 428 U.S. 543, 552, 562 (1976). The Court has upheld sobriety checkpoints used to determine if drivers are under the influence of alcohol. *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 455 (1990). And in *Illinois v. Lidster*, 540 U.S. 419, 422, 428 (2004), the Court

upheld a suspicionless highway checkpoint search conducted near the location of a recent hit-and-run, set up for the purpose of asking drivers about the accident. The Supreme Court additionally "ma[de] clear" in *Indianapolis v. Edmond* that a "'roadblock with the primary purpose of verifying drivers' licenses and vehicle registrations would be permissible' because it rests on a purpose of ensuring 'highway safety' rather than general crime control." *Demarest*, 44 F.4th at 1220 (quoting *Edmond*, 531 U.S. at 38–39) (brackets omitted); *see also al-Kidd*, 563 U.S. at 736–37 (explaining that the Court "had previously approved vehicle checkpoints set up for the purpose of keeping off the road unlicensed drivers" in *Delaware v. Prouse*, 440 U.S. 648, 663 (1979)). An example from our own case law is *United States v. Fraire*, 575 F.3d 929 (9th Cir. 2009). There, we upheld a dragnet checkpoint set up at the entrance to a national park, at which park officers, as part of preventing illegal poaching, asked motorists if they had been hunting. *Id.* at 930–31.

The administrative use or special needs exception has also been invoked to justify warrantless searches of certain closely regulated businesses for specified purposes. *See Donovan v. Dewey*, 452 U.S. 594, 598 (1981) ("[L]egislative schemes authorizing warrantless administrative searches of commercial property do not necessarily violate the Fourth Amendment."); *Whalen*, 907 F.3d at 1151 (explaining that the administrative search exception applies to "inspections of regulated businesses"). Thus, the Supreme Court has approved of warrantless administrative searches of commercial establishments selling alcohol for purposes of checking compliance with federal laws governing such businesses, *see Colonnade Catering Corp. v. United States*, 397 U.S. 72, 76 (1970); of a pawn shop's gun storeroom for ensuring compliance with firearm laws, *see United States v. Biswell*, 406 U.S. 311, 312, 317 (1972); of automobile

junkyards, *see New York v. Burger*, 482 U.S. 691, 703–04 (1987), and stone quarries and mines, *see Donovan*, 452 U.S. at 606. Examples from our case law include administrative searches of massage parlors, *see Killgore v. City of S. El Monte*, 3 F.4th 1186, 1192–93 (9th Cir. 2021); day care centers, *see Rush v. Obledo*, 756 F.2d 713, 714 (9th Cir. 1985); and vessels in a salmon fishery, *see United States v. Raub*, 637 F.2d 1205, 1211 (9th Cir. 1980). These types of warrantless searches are justified because the regulatory presence "is sufficiently comprehensive and defined that the owner of the commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." *Donovan*, 452 U.S. at 600.

Under the broad heading of administrative or special needs searches, and in settings in which the government has a sufficient justification and need for particularized searching, courts have also upheld the warrantless search of particular types of persons thought to have reduced expectations of privacy, or persons in particular settings in which the same is true. The category of the former includes drug and alcohol testing of certain railroad industry employees, *see Skinner*, 489 U.S. at 634, and Customs Service employees seeking transfer or promotion to roles involving drug interdiction, *see Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 677 (1989); work-related searches of the desks and offices of government employees, *see O'Connor v. Ortega*, 480 U.S. 709, 725–26 (1987) (plurality op.); *id.* at 731–32 (Scalia, J., concurring); random drug testing of students involved in school athletics and competitive extracurricular activities, *see Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 650, 665 (1995); *Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls*, 536 U.S. 822, 838 (2002); and warrantless "home visits . . . to verify eligibility

for welfare benefits," *Sanchez v. Cnty. of San Diego*, 464 F.3d 916, 926, 928 (9th Cir. 2006).

Examples of particular settings in which certain warrantless searches are permitted are airport screens of passengers and luggage for weapons and explosives, *United States v. Davis*, 482 F.2d 893, 912 (9th Cir. 1973), *overruled on other grounds by United States v. Aukai*, 497 F.3d 955, 960–62 (9th Cir. 2007) (en banc), including more intrusive searches following the September 11 terrorist attacks, *see Aukai*, 497 F.3d at 956–57; and screens of persons entering courthouses to search for weapons, *see McMorris v. Alioto*, 567 F.2d 897, 898–99 (9th Cir. 1978).  As the Supreme Court has explained, "where the risk to public safety is substantial and real, blanket suspicionless searches calibrated to the risk may rank as 'reasonable'—for example, searches now routine at airports and at entrances to courts and other official buildings." *Chandler v. Miller*, 520 U.S. 305, 323 (1997).

This survey of administrative search exception case law is not meant to be exhaustive, and the cases could perhaps be organized in different ways.  But our discussion does reveal several relevant points.  The first is that neither the Supreme Court nor this court has limited application of the administrative search exception to particular contexts or factual scenarios.  That there is not a prior case applying the administrative search exception to tire chalking, or some other parking enforcement mechanism, is therefore not dispositive.  The same could have been said of other administrative searches occasioned by their own societal or technological developments.  Instead, as new governmental needs arise, the Supreme Court has evaluated whether a particular type of search or seizure incident to those needs should be exempted from the warrant requirement.  Our task is not to treat existing case law as an exclusive firmament

restricting the scope of the administrative search exception, but to reason by analogy from current doctrine, based on the principles that animate the jurisprudence in this area.

One such guiding principle is that warrantless administrative searches must bear a sufficient connection to the governmental interests they serve and cannot advance as their "primary purpose" "uncover[ing] evidence of ordinary criminal wrongdoing." *Edmond*, 531 U.S. at 41–42. Another broader principle is that "where a Fourth Amendment intrusion serves special government needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." *Von Raab*, 489 U.S. at 665–66. Yet another grounding precept is that even when "a warrant is not required, a search is not beyond Fourth Amendment scrutiny; for it must be reasonable in its scope and manner of execution." *Maryland v. King*, 569 U.S. 435, 448 (2013). In other words, "[w]hile administrative searches are an exception to the Fourth Amendment's warrant requirement, they are not an exception to the Fourth Amendment's standard of reasonableness." *United States v. Bulacan*, 156 F.3d 963, 967 (9th Cir. 1998).

At the same time, however, these broader principles and the case law from which they are derived should not be misconstrued as creating absolute "floors" drawn from the particular facts of individual cases. That would effectively calcify the factual premises of other cases into hard-and-fast sub-rules, without justification in the core Fourth Amendment precepts we have discussed above. Thus, for example, although we can agree that double parking may present less acute dangers than drunk driving, we do not

think it then follows that tire chalking can never fall within the administrative search exception.

Nor do we think the administrative search exception invariably requires a special need premised on an imminent threat to public health or safety, or circumstances otherwise demanding immediate action in the face of dangerous conditions, as the plaintiffs here maintain. Some cases in this area surely do involve those circumstances, and we do not doubt this as a relevant factor in the reasonableness analysis. But we do not read the cases to impose this as a threshold legal requirement, without which the administrative search exception cannot apply. Indeed, such a requirement would be inconsistent with various administrative search exception cases, such as the Supreme Court's allowance of drivers' license checkpoints, *see al-Kidd*, 563 U.S. at 736–37; *Edmond*, 531 U.S. at 38–39; of a warrantless search of a student's purse for cigarettes, *New Jersey v. T.L.O.*, 469 U.S. 325, 343 (1985); and of periodic searches of regulated businesses, *see, e.g.*, *Burger*, 482 U.S. at 703 (junkyards); *Colonnade Catering*, 397 U.S. at 76–77 (search of liquor store to check for tax compliance), to name just a few.

## C

Consistent with the foregoing principles, courts have devised accompanying doctrinal tests that are used to determine whether the administrative search exception applies in particular contexts. Although these doctrinal formulations vary from context to context, they are ultimately intended to serve the underlying Fourth Amendment interests we have discussed above. In our view, tire chalking is most factually and legally analogous to a motorist dragnet. So we find it appropriate to analyze this case under the doctrinal formulation of the administrative

search exception set forth in the vehicle dragnet cases. But we will also draw on administrative search cases outside that context in explaining our result.

First, though, we explain the analogy to the motorist dragnet cases. A dragnet is a "search[] or seizure[] of every person, place, or thing in a specific location or involved in a specific activity." Primus, 111 Colum. L. Rev. at 260. That is what the City of San Diego did here. A City parking enforcement officer places a chalk mark on every vehicle in a given area. Officers do not have discretion to chalk certain vehicles only. The chalking is not done based on individual suspicion that certain drivers may have over-extended their welcome in a city parking spot, but as part of a broader programmatic effort of maintaining the flow of traffic and monitoring the parking times of all visitors.

That San Diego has accomplished its objective through a possible "search" rather than a seizure does not make it any less of a dragnet. Instead of stopping all drivers outside a busy city parking area and asking if they parked longer than a certain amount time—like the national park service officers who asked about hunting in *Fraire*—the City has developed a more expedient process that involves the impermanent dusting of chalk on tire tread. But the much less intrusive nature of the City's actions as compared to a checkpoint does not diminish the comparison to a dragnet. We will thus work within the basic contours of the motorist checkpoint doctrine, with due regard for the fact that we have here a possible search rather than a seizure.

In the checkpoint context, we have reduced the Supreme Court's guidance to a two-part analysis. *See Demarest*, 44 F.4th at 1220; *Fraire*, 575 F.3d at 932. First, we will ask whether the search is "'per se invalid' because its 'primary purpose' is 'to advance the general interest in crime control'

with respect to" the drivers of the vehicles that are chalked. *Demarest*, 44 F.4th at 1220 (quoting *Fraire*, 575 F.3d at 932). If the search is not per se invalid, we will proceed to the second step of the analysis and determine whether the search is "reasonable[]," "on the basis of the individual circumstances." *Id.* (quoting *Fraire*, 575 F.3d at 933); *see also Lidster*, 540 U.S. at 426; *Edmond*, 531 U.S. at 47.

**1**

As to the first step, we have little difficulty concluding that tire chalking does not have the impermissible "primary purpose" of "uncover[ing] evidence of ordinary criminal wrongdoing." *Edmond*, 531 U.S. at 41–42. To satisfy the administrative search exception, the search's primary purpose must not be "general crime control." *Id.* at 43; *see also Patel*, 576 U.S. at 420 (explaining the permissibility of warrantless administrative searches "where the primary purpose of the searches is distinguishable from the general interest in crime control") (quotations and brackets omitted).

Here, the "primary purpose" of tire chalking is not a general interest in crime control, but to assist the City in its overall management of vehicular traffic and the use of city parking spots. *See Demarest*, 44 F.4th at 1220 (explaining that under *Edmond* and *Sitz*, a DUI checkpoint has the "primary purpose of 'ensuring roadway safety,'" which is "materially distinguishable from the impermissible primary purpose of 'serv[ing] the general interest in crime control'" (quoting *Edmond*, 531 U.S. at 41–42)). Chalking is part of San Diego's broader effort to ensure the free flow of traffic and mitigate the harms of congested city streets. As an enforcement mechanism, chalking also functions as a deterrent, encouraging compliance with City parking regulations. *See Fraire*, 575 F.3d at 933 (explaining that a checkpoint for illegal hunting "deter[s] would-be

poachers"). That chalking "accomplishe[s] this goal through the use of law enforcement techniques does not automatically transform it into a crime control device for Fourth Amendment purposes." *Id*.

It is true, of course, that chalking can lead to a driver receiving a parking citation. But many administrative searches that have been upheld against Fourth Amendment challenges yielded evidence of law violation that could lead to criminal or other consequences. A DUI checkpoint, for example, can lead to arrests for drunk driving. An immigration checkpoint can lead to arrests for immigration violations. Sometimes administrative searches lead to arrests for violations *outside* the stated purpose of the administrative search, and yet even then they may be permissible. In *Fraire*, for instance, we upheld a checkpoint at a national park entrance asking whether visitors had been hunting. 575 F.3d at 931, 935. Yet in *Fraire* itself, a park ranger who stopped a vehicle at the checkpoint noticed the smell of alcohol and observed the defendant exhibiting signs of drunkenness, which led to the defendant being charged with driving while intoxicated. *Id.* at 931. Even then we held that the warrantless checkpoint was permissible "[b]ecause the primary purpose of the checkpoint is distinguishable from the general interest in crime control." *Id.* at 933. In this case, and unlike other permitted administrative searches, the *only* information that tire chalking could reveal is how long a vehicle remained parked in a city parking space.

As we explained in *Fraire*, warrantless checkpoints have been found not to have general law enforcement as their primary purpose when there is a "close connection between the checkpoint and the harm it was seeking to prevent." 575 F.3d at 933. The Supreme Court's decisions in *Sitz* and *Edmond* showcase this distinction. *Sitz* upheld automobile

checkpoints to look for intoxicated drivers, 496 U.S. at 455, but then *Edmond* struck down virtually identical checkpoints to look for drugs. 531 U.S. at 44. *Edmond* explained that the DUI checkpoints at issue in *Sitz* served a permissible purpose because of the "obvious connection between the imperative of highway safety and the law enforcement practice at issue." 531 U.S. at 39; *see also id.* at 43. By contrast, the concealment of drugs had no close "connection to the roadway," so the drug checkpoint at issue in *Edmond* served only a "general interest in crime control." *Id.* at 43–44.

Here, as in *Sitz* and *Fraire*, there is a close connection between the chalking of tires and the harm it seeks to prevent, namely, vehicles staying too long in city spots. And because San Diego requires parking officers to chalk all cars in a given area, San Diego has avoided the "kind of standardless and unconstrained discretion" that has presented constitutional problems in other cases by raising the specter of a generalized law enforcement purpose. *Sitz*, 496 U.S. at 454 (quoting *Prouse*, 440 U.S. at 661).

For these reasons, we easily conclude that tire chalking does not have an impermissible primary purpose of uncovering evidence of ordinary criminal wrongdoing or serving a general interest in crime control. Chalking is therefore not "per se" invalid under the Fourth Amendment. *See Fraire*, 575 F.3d at 932.

**2**

Turning to the second part of the analysis, we now consider "the reasonableness" of the search "'on the basis of the individual circumstances.'" *Demarest*, 44 F.4th at 1220 (quoting *Lidster*, 540 U.S. at 426). This requires us to evaluate "[1] the gravity of the public concerns served by the

[search], [2] the degree to which the [search] advances the public interest, and [3] the severity of the interference with individual liberty." *Id.* at 1222 (quoting *Lidster*, 540 U.S. at 427). We conclude that, within the meaning of the Fourth Amendment, San Diego's practice of tire chalking is reasonable.

We begin with the gravity of the public concerns that chalking serves. One can of course review other administrative search exception cases and find instances in which a permitted search related to a more pressing danger. As we noted above, we do not mean to suggest that traffic congestion presents the same risk of harm as drunk driving. But at the same time, chalking is part of a broader program of parking and traffic management that reflects a substantial and "compelling administrative objective." *Bulacan*, 156 F.3d at 968 (quoting *United States v. $124,570 U.S. Currency*, 873 F.2d 1240, 1244 (9th Cir. 1989)). It does not take an advanced degree in urban planning to appreciate the significance of free-moving vehicular traffic and parking availability to the basic functioning of a municipality and the quality of life of its residents, businesses, and visitors.

The record amply reflects this. San Diego has demonstrated that failure to ensure compliance with City parking regulations can lead to double-parking, cruising, and illegal parking. These practices increase traffic congestion and can delay public transit; pose safety risks to pedestrians, bicyclists, and motorists; reduce air quality; and impede the movement of emergency vehicles. These harms also work to the City's fiscal detriment because local businesses depend on the availability of parking, and the City's tax revenues in turn depend on the level of commercial activity.

In a variety of different legal contexts, therefore, courts have recognized the strong governmental interest in

managing traffic and parking.  *See, e.g.*, *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994) ("The State also has a strong interest in . . . promoting the free flow of traffic on public streets and sidewalks . . . ."); *Prouse*, 440 U.S. at 658 ("[W]e are aware of the danger to life and property posed by vehicular traffic and of the difficulties that even a cautious and an experienced driver may encounter."); *Pimentel v. City of Los Angeles*, 974 F.3d 917, 924 (9th Cir. 2020) (recognizing that "overstay[ed] parking meters lead[] to increased congestion and impede[] traffic flow").

The plaintiffs do not disagree.  Though they challenge the means the City has chosen to further its objectives, in opposing summary judgment the plaintiffs themselves "d[id] not dispute the necessity or importance of enforcing time limits in City parking spaces."  Indeed, when discussing the asserted "emphasis on its safety, environmental, and business interests" that chalking serves, the plaintiffs "d[id] not dispute that such interests are significant, or that they may be served through parking enforcement."  We cannot conclude that the City's interests here are so insufficient as to preclude chalking.

Turning next to the degree to which chalking advances the public interest, we conclude that chalking is "appropriately tailored" to that interest. *Lidster*, 540 U.S. at 427.  As we described above, chalking bears a tight nexus to parking management.  Unlike other permitted administrative searches, it has no apparent "spillover" use outside of its stated purpose; there is no suggestion that chalking can yield evidence of any law violation other than overstaying a parking time limit.  And it is clearly "impracticable," *Skinner*, 489 U.S. at 631, to require San Diego to seek warrants for monitoring parking violations in thousands of parking spaces, which would create delays antithetical to the timely enforcement of parking regulations.  *See O'Connor*,

480 U.S. at 720 (explaining that "a warrant requirement is not appropriate when 'the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search'" (quoting *Camara v. Mun. Ct.*, 387 U.S. 523, 533 (1967)).

The plaintiffs respond that there are various other methods of parking enforcement that San Diego could use besides chalking. But the City already employs other approaches in addition to chalking. And the City reasonably explained why some of the plaintiffs' preferred enforcement methods were not feasible replacements for tire chalking. This debate about other approaches the City might have taken is also beside the point: the Supreme Court has "repeatedly refused to declare that only the least intrusive search practicable can be reasonable under the Fourth Amendment." *City of Ontario, Cal. v. Quon*, 560 U.S. 746, 763 (2010) (quoting *Vernonia*, 515 U.S. at 663). Otherwise, plaintiffs' "less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers, because judges engaged in *post hoc* evaluations of government conduct can almost always imagine some alternative means by which the objectives of the [government] might have been accomplished." *Skinner*, 489 U.S. at 629 n.9 (quotations omitted).

We lastly consider the severity of the interference that chalking may have on individual liberty. *Lidster*, 540 U.S. at 427. Suffice it to say, it is hard to imagine a "search" that involves less of an intrusion on personal liberty than the temporary dusting of chalk on the outer part of a tire on a vehicle parked in a public space. Chalking involves no detention of persons or property; it does not damage property or add anything permanent to it; and the search does not create "substantial anxiety," as some searches may. *See Prouse*, 440 U.S. at 657. If being stopped at a lawful vehicle

checkpoint "interfere[s] only minimally with liberty of the sort the Fourth Amendment seeks to protect," *Lidster*, 540 U.S. at 427, the interference with liberty that chalking causes is infinitesimal.

**3**

The context in which chalking is used only further bears out our reasonableness analysis. There is already a reduced expectation of privacy for vehicles. *See, e.g.*, *Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018); *South Dakota v. Opperman*, 428 U.S. 364, 367–68 (1976). That is even more so when the vehicle is parked on city streets, where drivers frequently find fliers affixed to their windshields and can also reasonably expect greater administrative scrutiny for compliance with parking laws—expectations not unlike those of the closely regulated businesses for which the administrative search exception is routinely applied. Simply put, tire chalking does not present the risks of government abuse or overreach that may be present in other contexts in which the government seeks to operate without a warrant.

Thus, however much plaintiffs may attempt to argue that San Diego's asserted interest is not as strong as other situations in which administrative searches have been allowed, the degree of intrusion on personal liberty here is correspondingly vastly lower. And we think the Fourth Amendment reasonableness analysis must permit some degree of offset of these considerations when the government's asserted interest is permissible, as it is here. *See Sitz*, 496 U.S. at 450, 453 (applying a "balancing analysis"). Indeed, although the "administrative search" label has been applied to a wide variety of different types of searches and seizures, what says "administrative search" more than a discretion-free program of lightly chalking tires to monitor how long vehicles have stayed in parking spaces?

Tire chalking would seem to present a considerably stronger case under the core principles motivating the administrative search exception than many past cases that have already endorsed its use.

All of this confirms that the plaintiffs' position cannot be readily situated within a coherent theory of Fourth Amendment jurisprudence. Without a warrant, people can be lawfully stopped at road checkpoints for detecting drunk driving, driving without a license, and illegal hunting; government employees and students can be lawfully searched, including through drug testing; closely regulated businesses can be subject to periodic inspection; and airplane passengers can have their luggage opened and their bodies patted down. People can also be detained based only on reasonable suspicion of wrongdoing ("not a particularly high threshold to reach"), *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc), and can be arrested based only on probable cause ("not a high bar"). *Kaley v. United States*, 571 U.S. 320, 338 (2014). Within this body of established law, it would be passing strange if tire chalking, of all things, were somehow a Fourth Amendment red line that cannot be crossed. That is not a theory we can endorse. And that is especially so when the upshot of plaintiffs' lawsuit is that San Diego should instead use other methods of enforcement—such as photographing cars or using license plate reader technology and GPS data—that would ironically invite greater intrusions into personal privacy.

**D**

For these reasons, we respectfully part ways with the Sixth Circuit's decision in *Taylor v. City of Saginaw*, 11 F.4th 483, 488–89 (6th Cir. 2021) ("*Taylor II*"), which held that tire chalking was not subject to the administrative search

exception (but which expressed no opinion on whether chalking might be subject to some other exception to the warrant requirement). While we are reluctant to create a possible circuit split, we do not find *Taylor II*'s analysis persuasive.

*Taylor II* viewed the question of a special governmental need narrowly by focusing on whether a municipality can enforce its parking regulations without relying on chalking. *See id.* at 489. *Taylor II* emphasized that a parking officer's "job was not impacted in any respect if she did not chalk tires," and that "for nearly as long as automobiles have parked along city streets, municipalities have found ways to enforce parking regulations without implicating the Fourth Amendment." *Id.* But the relevant question is not whether there are other parking enforcement methods that would not constitute Fourth Amendment searches; it is whether tire chalking fits within the administrative search exception under the governing principles and precedents. For the reasons we have given, it does.

We also respectfully disagree with our fine dissenting colleague, who like the Sixth Circuit would hold that tire chalking is unconstitutional, but on a very different rationale. In the dissent's view, tire chalking is unlawful under "the original understanding of the Fourth Amendment." On this point, the dissent seriously fails in its proof.

Merely citing the general concerns that animated the Fourth Amendment and some basic legal history, as the dissent does, hardly proves the more specific proposition that tire chalking violates the Constitution. Far, far more historical and originalist analysis would be required to reach that conclusion and to take the significant step of constitutionalizing the well-established technical traffic policy choices of municipalities across this Circuit. *See*

*Vernonia*, 515 U.S. at 653–54 (explaining that in the administrative search context, "where there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted, whether a particular search meets the reasonableness standard is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests") (footnote and quotations omitted).

Nor can tire chalking be made to violate the Constitution through hyperbole. The dissent offers no support for its grandiose suggestion that the benign practice of lightly dusting chalk on the tire of a car parked in a city space is comparable to the "Crown officials' abuse of investigative tools" that "helped spark the American Revolution." And the dissent's apparent contention that tire chalking "'exhibit[s] *the same characteristics* as general warrants and writs'" is obviously inaccurate. The general warrants of the colonial era "allowed royal officials to search and seize whatever and whomever they pleased while investigating crimes or affronts to the Crown," *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011), with officers "rummag[ing] through homes in an unrestrained search for evidence of criminal activity." *Riley v. California*, 573 U.S. 373, 403 (2014). Tire chalking is of course not that.

Much of the dissenting opinion appears grounded in the belief that the entire administrative search doctrine is an affront to the original meaning of the Fourth Amendment and should therefore be extremely limited in its application. But the Supreme Court has never said this. The dissent's high-level historical overview certainly does not prove it, either. And the same can be said of the dissent's repeated reliance on a dissenting opinion from Justice O'Connor in *Vernonia*, which of course is not the law.

The dissent not only fails to explain why the original meaning of the Fourth Amendment requires its result, it is essentially in opposition to longstanding Supreme Court precedent setting forth an exception for certain administrative searches. "As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is 'reasonableness,'" and "a warrant is not required to establish the reasonableness of *all* government searches." *Vernonia*, 515 U.S. at 653. The administrative search exception is a paradigmatic example of this. The dissent's assertion that individualized suspicion is required for a search "[a]bsent a well-recognized exception" elides the fact that the administrative search exception *is* such a well-recognized exception.

To this point, and tellingly, the dissent does not even purport to work within the Supreme Court's established doctrinal framework governing this area. The dissent states that the administrative search exception is limited to "pressing and exceptional" and "extraordinary and immediate" governmental interests, reserved for "uniquely urgent and exceptional cases" that involve "immediate and unusual governmental hardships." The Supreme Court has never required any of this. And as we explained above, this type of exceedingly high threshold would be inconsistent with many cases in this area of law from both the Supreme Court and this court.

In claiming that tire chalking fails under the administrative search exception, the dissent also misconstrues precedent by plucking stray words in the Supreme Court's *Edmond* decision and redeploying them out of context. The dissent states that the administrative search exception cannot be "used to support suspicionless searches for 'ordinary' and 'ever-present' government

interests." (quoting *Edmond*, 531 U.S. at 44). But the problem in *Edmond* was not the magnitude of the government's interest in drug interdiction, which the Court fully endorsed. *See Edmond*, 531 U.S. at 42. It was that, unlike the sobriety checkpoint in *Sitz*, a vehicle checkpoint search for drugs had no close "connection to the roadway," meaning that its primary purpose was a "general interest in crime control" not related to the nature of the stop. *Id.* at 43–44.

The actual quote from *Edmond* from which the dissent draws reads: "We decline to suspend the usual requirement of individualized suspicion where the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes. We cannot sanction stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime." *Id.* at 44. This passage speaks to the required relationship between the harm and the dragnet. As we have explained, San Diego's tire chalking policy—a discretion-free traffic management tool that bears a close connection to the harm it seeks to prevent and yields no evidence of any other law violation—clearly does not have the impermissible "primary purpose" of "uncover[ing] evidence of ordinary criminal wrongdoing." *Edmond*, 531 U.S. at 41–42. The dissent ignores the tests that govern our review.

Equally misleading is the dissent's quoting of *Edmond* for the asserted proposition that the Supreme Court has left "the administrative-search exception open for 'emergenc[ies]' and 'exigencies' like thwarting 'an *imminent* terrorist attack' or catching 'a *dangerous* criminal.'" (quoting *Edmond*, 531 U.S. at 44). In the passage the dissent quotes, the Supreme Court was making clear that there are some dire circumstances that would justify a

suspicionless checkpoint search *even in the name of general crime control* disconnected from roadway safety. *See Edmond*, 531 U.S. at 44 (explaining that "[o]f course, there are circumstances that may justify a law enforcement checkpoint where the primary purpose would otherwise, but for some emergency, relate to ordinary crime control," and listing terrorist attacks or catching a dangerous fleeing criminal as examples). The Court was by no means suggesting that these circumstances must be present when, as here, the primary purpose of the search is *not* a generalized interest in crime control.

The dissent's unsupported and revisionist account of Fourth Amendment doctrine is not one we are permitted to follow. For the reasons we have given, whatever may be said of tire chalking, the Fourth Amendment does not forbid it.

\* \* \*

The judgment of the district court is

**AFFIRMED.**

BUMATAY, Circuit Judge, dissenting:

The City of San Diego marks with chalk every parked vehicle on certain city streets on the chance that a car might overstay its allotted time. It does so with no warrant, no suspicion of an ordinance violation, and no pressing and exceptional governmental interest. The City thus violates the constitutional rights of its citizens.

No matter how well meaning, modest, or longstanding the intrusion into personal effects, the Fourth Amendment commands that all government searches, with some narrow exceptions, be supported by a warrant and individualized suspicion of wrongdoing. That government officials must have *reason* to suspect lawbreaking before initiating a search stems directly from our Founding generation's aversion to Crown officials' abuse of investigative tools to search and seize at will and without explanation. Those encounters helped spark the American Revolution and led to the Fourth Amendment and its protection from "unreasonable" searches and seizures, which was meant to forever bar such baseless intrusion into lives and property of others.

Undaunted by the constitutional design, the City argues that its interests in improving traffic congestion justify dispensing with individualized suspicion. But neither the original understanding of the Fourth Amendment nor Supreme Court precedent permit a policy of indiscriminate searches for such an ordinary government enterprise. While chalking tires may not constitute the greatest affront to personal liberty, our duty is to safeguard against even "stealthy encroachments" on the Fourth Amendment. *Boyd v. United States*, 116 U.S. 616, 635 (1886). Thus, I would not expand Fourth Amendment exceptions to accommodate the City's chalking program and I would hold that it is unconstitutional.

For these reasons, I respectfully dissent.

## I.

## The City's Chalking Policy Violates the Fourth Amendment

The Fourth Amendment commands that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.

The Amendment "is to be construed in the light of what was deemed an unreasonable search and seizure when it was adopted." *Carroll v. United States*, 267 U.S. 132, 149 (1925). After all, "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." *District of Columbia v. Heller*, 554 U.S. 570, 634–35 (2008). Thus, we rely "on history to inform the meaning of constitutional text." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2130 (2022).

By its text, the Fourth Amendment requires us to first determine whether a government action constitutes a "search" and, if so, whether the search was "unreasonable." In resolving these questions, we are guided by historical sources. *Bruen*, 142 S. Ct. at 2130. Based on the original understanding of the Amendment, the City's chalking policy is both a "search" and "unreasonable" and thus violates the Fourth Amendment.

## A.

## Tire Chalking is a Search

Under both the original understanding of the Fourth Amendment and modern precedent, we apply a "property-based approach" to determine whether government action is a "search." *See, e.g.*, *United States v. Jones*, 565 U.S. 400 (2012); *Florida v. Jardines*, 569 U.S. 1 (2013). Here, the City admits that its chalking policy requires parking enforcement officers to mark the tires of privately owned vehicles lawfully parked on public streets. Under a common-law trespass inquiry, the City's tire chalking easily constitutes a "search" subject to Fourth Amendment protections.

As a historical matter, the Fourth Amendment had a "close connection to property." *Jones*, 565 U.S. at 405. For much of this country's history, Fourth Amendment jurisprudence was "tied to common-law trespass." *Id*. And under a common-law trespassory test, any government intrusion on property is trespass no matter that "[the trespasser] does no damage at all." *Id*. (quoting *Entick v. Carrington*, 95 Eng. Rep. 807, 817 (C.P. 1765)). While modern jurisprudence has built upon this "property-based approach," our law continues to hold "the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave." *Id*. (quoting *Entick*, 95 Eng. Rep. at 817); *see also id.* at 405, 409 (explaining that *Katz*'s reasonable expectation of privacy test has been "*added to*, not *substituted for*, the common-law trespassory test"). Thus, when a government official physically intrudes on property in "an attempt to find something or to obtain information," a search has occurred under the Fourth Amendment. *Id*. at 408 n.5.

In *Jones*, the Supreme Court held that agents conducted a Fourth Amendment search by placing a GPS tracker on the undercarriage of a car. *Id*. at 404–05. In installing the GPS device, "[t]he Government physically occupied private property for the purpose of obtaining information." *Id.* at 404. "[S]uch a physical intrusion," the Court reasoned, "would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted." *Id.* at 404–05.

One year later, in *Jardines*, the Court continued the emphasis on the property-based view of the Fourth Amendment. There, the Court said the use of a drug-sniffing police dog to explore the curtilage of a home was a "physical intrusion." 569 U.S. at 11. In that case, police handlers let the police dog rummage through the curtilage of the house until the canine alerted to the odor of narcotics at the front door. *Id*. at 4. Sure enough, after officers applied for a warrant to search the house, they found marijuana plants stashed in the property. *Id*. The Court concluded, "[w]hen the Government obtains information by physically intruding on persons, houses, papers, or effects, a search within the original meaning of the Fourth Amendment has undoubtedly occurred." *Id.* at 5 (simplified). To the Court, such a "property-rights baseline . . . keeps easy cases easy." *Id*. at 11. Whenever officers "learn[] what they learn[] only by physically intruding on [private] property," then that is enough to "establish that a search occurred." *Id*. And it makes no difference that odor-detecting dogs "have been commonly used by police for centuries." *Id*. That's because "when the government uses a physical intrusion to explore details" of private property, "the antiquity" or longstanding value of the tools they use is irrelevant to the Court's analysis. *Id.*

In applying this property-based approach, our court has found even modest intrusions into personal effects to be searches under the Fourth Amendment. For example, an officer inserting a key into a locked vehicle to see if it worked was a Fourth Amendment search. *United States v. Dixon*, 984 F.3d 814, 820 (9th Cir. 2020). By "insert[ing] the key into the minivan's lock, an 'effect,'" we explained that the officer "physically intruded onto a constitutionally protected area . . . for the express purpose of obtaining information." *Id.* Similarly, an officer who opened a car door and leaned in to ask the driver questions had committed a search. *United States v. Ngumezi*, 980 F.3d 1285, 1289 (9th Cir. 2020). "Although the intrusion . . . may have been modest," we emphasized that "the Supreme Court has never suggested that the magnitude of a physical intrusion is relevant to the Fourth Amendment analysis." *Id*.

So at its core, a Fourth Amendment search occurs when there is (1) a physical intrusion, (2) of a person or protected area ("persons, houses, papers, or effects"), (3) to obtain information or find something. Based on this understanding and our precedents, it is no heavy lift to hold that tire chalking is a "search" under the Fourth Amendment.

First, tire chalking is a "physical intrusion" because an officer must physically touch and mark the tire to leave a visible chalk mark. And it makes no difference that the contact is modest or causes no lasting damage. If placing a key into a car door (*Dixon*) or leaning into an open door constitute a search (*Ngumezi*), then the physical touching and marking of vehicles must also count.

Second, the tires of privately owned vehicles are "effects" under the Fourth Amendment and are thus protected areas. As the Court has said, "[i]t is beyond dispute that a vehicle is an 'effect' as that term is used in the

Amendment." *Jones*, 565 U.S. at 404. And I see no distinction between the undercarriage and the tires of a vehicle for Fourth Amendment purposes.

And third, tire chalking is done to obtain information about how long the car has been parked at the same location. As *Dixon* and *Ngumezi* show, it's irrelevant that the government's snooping was only seconds long. As long as there's a physical intrusion coupled with government information gathering, then it's a search. Here, it's still a search even though the chalk on the tire—and the government's tracking of the vehicle—lingers for only a few hours.

As a result, this is an "easy case[]," *Jardines*, 569 U.S. at 11, the City's tire chalking is a Fourth Amendment search. So rather than simply *assume* that chalking is a Fourth Amendment search and sow confusion over the law, I would hold that it is unequivocally one. *See also Taylor v. City of Saginaw*, 11 F.4th 483, 487 (6th Cir. 2021) ("[C]halking is a search for Fourth Amendment purposes under the property-based *Jones* test.") (simplified).

## B.

### Tire Chalking is Unreasonable

We next turn to whether the City's tire chalking policy is constitutionally reasonable. As a matter of original understanding, the Fourth Amendment protects against suspicionless searches. "A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). Here, the City's tire-chalking policy indiscriminately targets lawfully parked vehicles for chalking and so it's presumptively unreasonable.

The City, however, argues that its tire-chalking policy falls under an "administrative search" exception to the Fourth Amendment's prohibition against suspicionless searches. But given the history of the Fourth Amendment and the limited scope of the administrative search doctrine, the City's argument fails.

While an exhaustive history of the meaning of the Fourth Amendment would not be possible in these pages, a brief review is illuminating. "[B]y looking to tradition and history, we see how constitutional text came to be and how the People closest to its ratification understood and practiced the right." *Duncan v. Bonta*, 19 F.4th 1087, 1150 (9th Cir. 2021) (en banc) (Bumatay, J., dissenting). At the very least, by embracing the historical record, we can prevent further deviations "from the original understanding of the Constitution." *Mai v. United States*, 974 F.3d 1082, 1091 (9th 2020) (Bumatay, J., dissenting from denial of reh'g en banc). Indeed, relying on history to inform constitutional meaning is "more legitimate[] and more administrable," than asking judges to make difficult interest-balancing calculations. *Bruen*, 142 S. Ct. at 2130. And here, history explains why we should not be so quick to expand Fourth Amendment exceptions to accommodate the City's chalking policy.

### 1.

### Protection Against Suspicionless Searches

As a general matter, one of the evils that the Fourth Amendment was designed to protect against was the abuse of suspicionless general warrants. *See* William J. Cuddihy, *The Fourth Amendment: Origins and Original Meaning*, 603–12, 691–724 (2009). These general warrants allowed government officers to search a property or person for

evidence of wrongdoing without designating what they were looking for or why they had suspicion to search. Of particular concern to our Founding generation was the issuance of "writs of assistance," which empowered revenue officers to search suspected places for smuggled goods at their discretion. *Boyd*, 116 U.S. at 625. Revolutionary-era Massachusetts lawyer James Otis pronounced these writs as "the worst instrument of arbitrary power, the most destructive of English liberty and the fundamental principles of law" because they placed "the liberty of every man in the hands of every petty officer." *Id.* (simplified). Indeed, the Fourth Amendment "reflect[s] the determination of those who wrote the Bill of Rights that the people of this new Nation should forever 'be secure in their persons, houses, papers, and effects' from intrusion and seizure by officers acting under the unbridled authority of a general warrant." *Stanford v. State of Tex.*, 379 U.S. 476, 481 (1965).

### Early History

For centuries predating the Founding of our country, suspicionless general warrants and writs of assistance permitted great exercises of arbitrary power. *See* Thomas K. Clancy, *The Role of Individualized Suspicion*, 25 U. Mem. L. Rev. 483, 528–29 (1995). These tools rose to prominence during the reign of Charles I when the Crown issued writs of assistance, imposed by the Star Chamber, without any suspicion of illegal activity and enforceable wherever Crown officers pleased. *See id.* at 497. Such officers were authorized "to enter into any vessel, house, warehouse, or cellar, search in any trunk or chest and breach any bulk whatsoever[.]" *Id.* (simplified).

Over time, the English writs of assistance made their way to the colonies. From as early as 1696, English officers could seek writs of assistance to enforce customs laws in the

colonies. *Id*. at 502. A prominent example occurred in 1761 during *Paxton's Case*. There, an English officer, Charles Paxton, was authorized by a writ to search places he suspected of containing contraband. Cuddihy at 378. It was this case that caused Otis to forcefully argue against the writs' "total[] annihilat[ion]" of the "most essential branches of English liberty." *Id.* Although Otis lost his case, John Adams would later observe that his argument was a "flame of fire" that helped ignite the American Revolution. *See Frank v. Maryland*, 359 U.S. 360, 364 n.3 (1959).

Resistance to these general warrants came from both sides of the Atlantic. One famous English case was *Entick*, 95 Eng. Rep. 807—a case familiar to "'every American statesman' at the time the Constitution was adopted[] and considered to be 'the true and ultimate expression of constitutional law' with regard to search and seizure." *Jones*, 565 U.S. at 404 (quoting *Boyd*, 116 U.S. at 626–27). In that 1765 libel case, a Crown officer issued a warrant to seize an author, John Entick, and to search his books and papers without limitation. But Lord Camden observed "one should naturally expect that the law to warrant [such power] should be clear in proportion as the power is exorbitant. If it is law, it will be found in our books. If it is not to be found there, it is not law." 19 T.B. Howell, *A Complete Collection of State Trials* 1066 (5th ed. 1816). If the case was decided in the government's favor, Lord Camden cautioned that "the secret cabinets and bureaus of every subject in this kingdom will be thrown open to the search and inspection of a messenger, whenever the secretary of state shall think fit to charge, or even to suspect, a person to be the author, printer, or publisher of a seditious libel." *Id*. at 1063. He went on, "[i]f libels may be seized it ought to be laid down with precision, when, where, upon what charge, against whom, by what magistrate, and in what stage of the prosecution." *Id*. at 1071. Lord Camden ruled for Entick and found the

government's action to be a trespass. Thus, shortly before the Founding, even English courts had begun to require some form of suspicion before allowing the use of a writ of assistance.

### State Constitutions and State Practice

The suspicionless writs of assistance were considered so oppressive that, when colonies became newly independent States, they acted quickly to prohibit them. *See* Nelson Lasson, *The History and Development of the Fourth Amendment* 79–83 (1970).

The Virginia Bill of Rights of 1776, for example, considered "general warrants, whereby an officer or messenger may be commanded to search suspected places without evidence of a fact committed, or to seize any person or persons not named, or whose offense is not particularly described and supported by evidence, are grievous and oppressive and ought not to be granted." Va. Const. art. I, § 10.

Maryland's 1776 constitution incorporated a protection that "all general warrants—to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special—are illegal, and ought not to be granted." Md. Const. art. I, § 23 (1776) *reproduced in* 3 Francis N. Thorpe, *The Federal and State Constitutions* 1688 (1909).

Directly foreshadowing the text of the Fourth Amendment, the Massachusetts Constitution of 1790 guaranteed that "[e]very subject has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers, and all his possessions" and that "[a]ll warrants . . . are contrary to this right, if the cause or

foundation of them be not previously supported by oath or affirmation . . . [or] not accompanied with a special designation of the persons or objects of search, arrest, or seizure." Mass. Const. art. XIV.

And Pennsylvania's 1776 constitution barred any search warrants made "without oaths or affirmations first made affording a sufficient foundation for them." Pa. Const. art. I, § 10 (1776) *reproduced in The Complete Bill of Rights* 345 (Neil H. Cogan ed., 2d ed. 2015).

Of course, there is some countervailing history. At the time of the Founding, general searches—even warrantless searches—were common for commercial establishments. Cuddihy at 743. For example, even States with protections against general warrants, like Massachusetts, New Hampshire, Connecticut, Pennsylvania, and Maryland, permitted warrantless inspections of breweries, bakeries, and certain other workplaces. *Id.* Indeed, warrantless inspection of "inns and similar places of public accommodation were commonplace" in early American history. *City of Los Angeles v. Patel*, 576 U.S. 409, 433, (2015) (Scalia, J., dissenting).

Even accounting for these exceptions, post-Revolution America expanded the category of "unreasonable search and seizure." As Cuddihy states, "[b]y 1787, the states had not only reified the right against unreasonable search and seizure but extended it, defined it, and, in a word, Americanized it." Cuddihy at 667. Along with halting general warrants, States declared unannounced searches and nighttime searches to be "unreasonable" and pioneered the warrant specificity requirement. *Id.* at 668. It is with this growing call for the protection against government intrusion into property and persons that our Nation ratified the Constitution.

### *Ratification of the Constitution*

So when it came time to draft the Fourth Amendment, the Framers understood the dangers posed by the suspicionless writs of assistance and general warrants. After the initial drafting of the Constitution, several proposals were made to add protections against their abuse. In one example, Richard Henry Lee of Virginia and Melancton Smith of New York proposed a prohibition of "unreasonable searches and seizures" as appeared in the Massachusetts Constitution. Cuddihy at 672. Such a proposal would proscribe general warrants but also a growing category of unreasonable searches and seizures. *Id*.

And in a broader effort, several prominent Anti-Federalists circulated pamphlets arguing that "general warrants, writs of assistance, and general excise searches" would flourish without express protections against them. *Id*. at 674–79. Anti-Federalist essayist, a "Farmer," for example, inveighed that the Constitution may revitalize general warrants because it offered no bill of rights prohibiting their use. Essays by a Farmer, Feb. 15, 1788, reprinted in Herbert Storing, the Complete Anti-Federalists vol. 5, 13-14 (1981). He feared that courts would not enforce protections against such warrants, "especially in those cases which may strongly interest the passions of government." *Id*. at 14.

More evidence of the distrust of suspicionless warrants comes from the debates that occurred at the State ratification conventions. Take Patrick Henry during the Virginia convention:

> [G]eneral warrants, by which an officer may search suspected places, without evidence of the commission of a fact, or seize any person, without

evidence of his crime, ought to be prohibited. As these are admitted, any man may be seized, any property may be taken, in the most arbitrary manner, without any evidence or reason. Every thing the most sacred may be searched and ransacked by the strong hand of power.

3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 532 (Jonathan Elliot ed., 2d ed. 1836).  And at the Maryland convention, a proposal was made to require a civil jury trial in "all cases of trespasses" where government officials would have to establish the reasonableness of the search by pointing to some basis of suspicion.  *See* Akhil R. Amar, *Fourth Amendment First Principles*, 107 Harv. L. Rev. 757, 777–78 (1994).

Indeed, it was the Anti-Federalist concern for general warrants that caused James Madison to present a federal bill of rights with protection against "unreasonable search and seizure" in 1789.  Cuddihy at 691–92.  Thus, the driving focus on limiting writs of assistance coupled with a reasonableness requirement suggests that the Fourth Amendment was intended to require some reason for suspicion.  *Cf.* Clancy, 25 U. Mem. L. Rev. at 528–31.

### *Early Congressional Practice*

Early Congressional practice confirms that a reasonable search needed some form of suspicion.  Starting with the first Congress—the same Congress that adopted the Fourth Amendment—statutes authorizing search also required a predicate of some suspicion.  For example, the first Congress passed the Act of 1789 which allowed federal naval inspectors to enter ships without warrants so long as they "shall have reason to suspect any goods, wares, or

merchandise subject to duty shall be concealed." Act of July 31, 1789, § 24, 1 Stat. 29, 43 (1789) (repealed 1790). Similar versions of this law were reauthorized in 1790, 1793, and 1799. *See* Amar, 107 Harv. L. Rev. at 766. Another early example was a 1791 Act that imposed duties on liquor and allowed the issuance of search warrants upon "reasonable cause of suspicion" that liquor had been concealed. Act of March 3, 1791, § 32, 1 Stat. 199, 207 (1791).

Congress generally continued this pattern throughout the nineteenth century. In 1815, Congress authorized customs officers to "stop, search, and examine any vehicle, beast, or person on whom they should suspect there was merchandise which was subject to duty." Act of March 3, 1815, 3 Stat. 231, 232 (1815). And Congress extended suspicion requirements for searches in Indian territory as well. For example, in 1822, Congress passed a law allowing Indian agents to search certain traders for liquor "upon suspicion or information that ardent spirits are carried into the Indian countries" by the traders. Act of May 6, 1822, 3 Stat. 682 § 2 (1822). And in 1834, Congress passed a similar law allowing Indian agents to search boats, stores, or places of deposit if the agents suspected the places contained liquor. Act of June 30, 1834, 4 Stat. 729, 732 (1834).

So throughout American history, including through the Fourth Amendment's incorporation against the States by the Fourteenth Amendment, warrantless and suspicionless searches were seen as "unreasonable."

\* \* \*

Put together, this historical evidence establishes that our Founding generation had a deep-seated aversion to suspicionless searches. As an original matter, absent a well-

recognized exception, any government policy that indiscriminately targets the property of others for search—without any suspicion of wrongdoing—is unreasonable. As Justice O'Connor explained, "the particular way the Framers chose to curb the abuses of general warrants—and by implication, *all* general searches—was not to impose a novel 'evenhandedness' requirement; it was to retain the individualized suspicion requirement . . . [and] to make that requirement meaningful and enforceable." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 670 (1995) (O'Connor, J., dissenting).

Here, the City's tire-chalking policy of warrantless *and* suspicionless searches faces a daunting climb given the original understanding of the Fourth Amendment. Unless the chalking policy can satisfy one of the limited exceptions to the individualized-suspicion requirement, it must be held unconstitutional. As the following shows, the City's policy fails to fit any Fourth Amendment exception.

**2.**

**The Administrative Search Doctrine**

Beginning in the 1960s, and continuing for several decades, the Supreme Court has fashioned exceptions to the Fourth Amendment's strict requirement of individualized suspicion. Sometimes collectively known as the "administrative search" doctrine, these exceptions were created to address certain narrow concerns, such as (1) public-safety code compliance, *see Camara v. Mun. Ct. of San Francisco*, 387 U.S. 523 (1967); (2) closely regulated businesses, *see Donovan v. Dewey*, 452 U.S. 594 (1981); (3) dragnets or checkpoints for imminent dangers, *see United States v. Martinez-Fuerte*, 428 U.S. 543 (1976); and (4) special needs populations, *see Griffin v. Wisconsin*, 483 U.S.

868 (1987). *See also* Eve B. Primus, *Disentangling Administrative Searches*, 111 Colum. L. Rev. 254, 260–61 (2011).

The City contends that its tire-chalking policy falls within the exception for warrantless and suspicionless "dragnet" searches because City officials exercise no discretion in marking vehicles, and its parking enforcement scheme is for an administrative purpose. In determining whether a government program meets this exception, courts look "closely at the nature of the public interests that such a regime is designed principally to serve." *Edmond*, 531 U.S. at 43. And the government has the burden of proving that its interests warrant this exception. *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012). But because the City's tire-chalking policy isn't designed to address a pressing and exceptional governmental interest, the City has failed to sustain its burden and its policy is unconstitutional.

The dragnet exception is potent. It authorizes a search or seizure of *every* effect or person at a specific location or engaged in a specific activity. *See* Primus, 111 Colum. L. Rev. at 260. Because dragnets operate without a warrant or individualized suspicion—the safeguards against arbitrary power—they have been justified in "only limited" contexts involving extraordinary and immediate governmental interests. *Edmond*, 531 U.S. at 41–42. And given the historical aversion to these suspicionless searches and the dictates of the Fourth Amendment, we must scrupulously guard against the expansion of government concerns that warrant this rare exception. As then-Judge Anthony Kennedy wrote, "[c]are must be taken so that the exception is not unduly extended." *McMorris v. Alioto*, 567 F.2d 897, 899 (9th Cir. 1978). Otherwise, we risk swallowing the protections of the Fourth Amendment within its exception

and putting—in the words of Otis—our "liberty . . . in the hands of every petty officer." *Boyd*, 116 U.S. at 625.

Indeed, both the Supreme Court and this court have established a high bar for justifying the suspension of the individualized-suspicion requirement—only relaxing the constitutional requirement for uniquely urgent and exceptional cases. The exception cannot, however, be used to support suspicionless searches for "ordinary" and "ever-present" government interests. *Edmond*, 531 U.S. at 44. And those routine, generalized government concerns are exactly what we see here.

Start with the exceptional concerns in *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976). In that case, the Court applied the exception to immigration checkpoints to stem the "flow of illegal entrants from Mexico." *Id*. at 552, 566. The Court noted the "formidable law enforcement problems" posed by border enforcement, *id.* at 552, including "well-disguised smuggling operations" and the fact that illegal immigration could not "be controlled effectively at the border," *id.* at 556–57. Based on this "great [need]," the Court authorized the suspicionless checkpoint seizures without a prior warrant as "necessary." *Id.* at 556–57, 562.

Or take the immediate danger faced in *Michigan Department of State Police v. Sitz*, 496 U.S. 444 (1990). That case extended the exception to sobriety checkpoints to take drunk drivers off the road. The Court emphasized the "magnitude of the drunken driving problem," including the significant "alcohol-related death and mutilation on the Nation's roads." *Id.* at 451. To the Court, the problem represented a "tragedy" and an "increasing slaughter." *Id*. (simplified). And this overwhelming interest was balanced against the "slight" intrusion on motorists caused by the

checkpoint.   Thus, the State had a strong interest in preventing the immediate hazard posed by drunk drivers and did not need individualized suspicion to perform the brief stops. *Id.* at 453.

*Edmond* then showed the outer limits of the exception. In that case, officers used drug-sniffing dogs at a vehicle checkpoint to interdict illegal drugs. *Edmond*, 531 U.S. at 40.   The Court struck down the program because it too broadly targeted "evidence of ordinary criminal wrongdoing."  *Id.* at 41–42.   It made clear that dragnet searches were "only limited exceptions," not to be extended to "generalized and ever-present" concerns.  *Id*. at 41, 44. And unlike the "problems of policing the border or the necessity of ensuring roadway safety," the city's interest in detecting drugs was an "ordinary enterprise" of government activity.  *Id*. at 44.  The Court concluded that the "general interest in crime control" can never justify suspicionless stops.  *Id*.  While leaving the administrative-search exception open for "emergenc[ies]" and "exigencies" like thwarting "an *imminent* terrorist attack" or catching "a *dangerous* criminal," the Court did not permit authorities to "simply stop cars as a matter of course to see if there just happens" to be a crime committed.  *Id*. (emphasis added).  "Without drawing the line at roadblocks designed primarily to serve the general interest in crime control," the Court feared that "the Fourth Amendment would do little to prevent such intrusions from becoming a routine part of American life." *Id.* at 42.

Next came approval of the exception for a specific and pressing concern in *Illinois v. Lidster*, 540 U.S. 419 (2004). There, officers set up a checkpoint to ask motorists for information about a recent hit-and-run.  *Id*. at 419.  Unlike the general crime control interest in *Edmond*, the "public concern [here] was grave" and the "stop's objective was to

help find the perpetrator of a specific and known crime, not of unknown crimes of a general sort." *Id.* at 427. Indeed, the purpose of the checkpoint was not to apprehend a vehicle's occupants, but to gather information to apprehend a specific lawbreaker on the lam. *Id*. at 423.

And our court has continued to apply the administrative search exception to immediate and unusual governmental hardships. Look at *United States v. Davis*, 482 F.2d 893 (9th Cir. 1973). There, we held airport screenings were valid administrative searches because they advanced the "grave and urgent" need to "prevent the carrying of weapons or explosives aboard aircraft" and "thereby . . . prevent hijackings." *Id.* at 908, 910. We then extended this screening search to courthouses to "secure [the] vital governmental interest" in "protecting sensitive facilities from a real danger of violence." *McMorris,* 567 F.2d at 899. The same goes for federal buildings. *United States v. Bulacan*, 156 F.3d 963, 968 (9th Cir. 1998). We even applied the exception to a "wildlife checkpoint" based on the unique interests in the case. *United States v. Fraire*, 575 F.3d 929 (9th Cir. 2009). There, a checkpoint at the entrance of a national park was permissible to "mitigate the illegal taking of animals in the park." *Id.* at 931. That's because the specific interest in "prevent[ing] hunters from destroying a precious natural resource," such as protected wildlife, compared to the "immediate harm to motorists" from a DUI checkpoint. *Id*. at 933.

So neither the Supreme Court nor our court has ever approved of an administrative search for such pedestrian concerns like the City asks us to. An administrative search must be limited to specific, imminent, and vital interests— rather than the routine, ordinary challenges often faced by governments. The *Sitz* checkpoints took an immediate hazard—drunk drivers—off the road. The *Martinez-Fuerte*

checkpoints deterred illegal aliens from absconding into the interior of the country. *Lidster* sought to solve a recent fatality. *Davis* prevented the hijacking of airplanes. And *McMorris* and *Bulacani* protected against real threats to government buildings. Even *Fraire* preserved endangered species. In all these cases, the government's suspicionless search was designed to address immediate and extraordinary interests. On the other hand, *Edmond* shows the dragnet exception has no application for "ordinary" and "general" governmental concerns—even as laudable an interest as interdicting illegal narcotics.

Simply put, the City's interests in perpetuating its parking enforcement regime don't chalk up. The City lists several benefits of its tire-chalking policy, such as improving traffic congestion, preventing pedestrians and bicyclists from breathing car exhaust, promoting a "dynamic and robust commercial district," and preserving "the quality of urban life." While all commendable goals, they fall well short of the type of singular interests justifying the rare exception to the individualized-suspicion requirement. The City argues that its interests resemble the "road safety" concern in *Sitz*. But the City asks us to equate concerns for ever-present traffic congestion with taking deadly drunk drivers off the road. There's no such equivalence. Nor do the City's interests look anything like other applications of the exception such as preventing hijacking (*Davis*), detecting human smuggling (*Martinez-Fuerte*), or catching a recent hit-and-run suspect (*Lidster*). In sum, the City's routine interests do not come close to prior applications of the administrative search exception. At core, the interests in reducing traffic congestion are too generalized and commonplace to support granting the City such substantial power.

If there was any remaining doubt, we must evaluate administrative search precedent under the original understanding of the Fourth Amendment. *See, e.g., Edmo v. Corizon*, 949 F.3d 489, 506 (Bumatay, J., dissenting from denial of reh'g en banc). Indeed, "[r]ather than rely on our own sense of what is the right balance of freedom and government restraint," we should "follow the meaning of the People's law as understood at the time it was enacted." *Duncan*, 19 F.4th at 1149 (Bumatay, J., dissenting). After all, our job as judges is to "preserve that degree of respect for the privacy of persons and the inviolability of their property that existed when the [Fourth Amendment] was adopted—even if a later, less virtuous age should become accustomed to considering all sorts of intrusion 'reasonable.'" *Minnesota v. Dickerson*, 508 U.S. 366, 380 (1993) (Scalia, J., concurring). And here, the individualized-suspicion requirement was a core feature of "reasonableness" at the time of the Founding. Indeed, "[t]he individualized suspicion requirement has a legal pedigree as old as the Fourth Amendment itself, and it may not be easily cast aside in the name of policy concerns." *Vernonia Sch. Dist.*, 515 U.S. at 678 (O'Connor, J., dissenting).

Given this history, "[c]an there be any doubt that the colonists would have vigorously opposed *warrantless* searches exhibiting *the same characteristics* as general warrants and writs" all for the sake of improving traffic? Yale Kamisar, *Does (Did)(Should) the Exclusionary Rule Rest on a 'Principled Basis' Rather than an 'Empirical Proposition'?*, 16 Creighton L. Rev. 565, 575 (1983). Obviously not. So rather than jumping straight into interest balancing every time the government seeks to effect some "administrative search," our duty should be to first ask whether the "magnitude of the State's interest," *Edmond*, 531 U.S. at 39, is sufficient to justify a suspicionless search as compared to historically recognized exceptions. Because

the City has failed to meet this threshold question, I would end the inquiry there.

## II.

The touchstone of the Fourth Amendment is, of course, reasonableness. But that doesn't mean that judges have free rein to interest-balance under whatever conception of "reasonableness" we like. At all times, we must be guided by the text and history of the Constitution. Those guideposts make clear that individualized suspicion is the norm when the government wants to search personal property. And while there are some limited circumstances that relax the requirement of individualized suspicion, we should disfavor any expansion of those exceptions given their tension with the original understanding of the Constitution. Otherwise, we leave "the liberty of every" person not only "in the hands of every petty officer" but also in the interest-balancing calculus of every judge.

To sum up: the administrative search exception is still the exception. It is no doubt true that law enforcement, traffic enforcement, and almost any other government function would be more efficient and more convenient if officers could skirt the Fourth Amendment. But inconvenience is the constitutional design. At least when issuing parking tickets, the City must obey the Fourth Amendment.

I respectfully dissent.